UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 08-21813-CIV-JORDAN

JANICE LANGBEHN, individually and as    )
Representative of the Estate of LISA    )
MARIE POND, DANIELLE LANGBEHN-          )
POND, KATELYN LANGBEHN-POND,            )
and DAVID LANGBEHN-POND                 )
                                        )
        Plaintiffs                     )
                                        )
vs.                                     )
                                        )
THE PUBLIC HEALTH TRUST OF              )
MIAMI-DADE COUNTY, d/b/a JACKSON        )
MEMORIAL HOSPITAL, GARNETT              )
FREDERICK, DR. ALOIS ZAUNER, and        )
DR. CARLOS ALBERTO CRUZ                 )
                                        )
        Defendants                     )
_____    )

**ORDER GRANTING MOTION TO DISMISS**

Currently pending is the defendants' motion to dismiss the amended complaint. Under the Rule 12(b)(6) standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), and for the reasons which follow, that motion [D.E. 31] is GRANTED.

**I. THE ALLEGATIONS**

The amended complaint alleges the following facts.[1]

Janice Langbehn and Lisa Marie Pond – residents and citizens of Washington – were committed life partners since 1987 and the parents of four jointly adopted children with special needs, including three minors (Danielle, Katie, and David). On February 17, 2007, the Langbehn-Pond family arrived in Miami to depart on a cruise. They never left on the cruise, however, because

---

[1]In their response to the motion to dismiss, the plaintiffs have added to, or amended, some of their factual allegations. Some examples of such attempts at constructively (and improperly) amending the complaint are listed in the defendants' reply memorandum. I do not consider any of these additional factual claims by the plaintiffs in ruling on the motion to dismiss.

on the following day, Ms. Pond – then 39 – collapsed aboard the cruise ship while it was docked at the Port of Miami.

An ambulance transported Ms. Pond to the Ryder Trauma Center at Jackson Memorial Hospital.[2] Ms. Pond was admitted at Ryder at around 3:30 p.m., and Ms. Langbehn, Danielle, Katie, and David arrived at approximately the same time or shortly thereafter.   Doctors Alois Zauner and Carlos Alberto Cruz were the attending physicians at Ryder responsible for Ms. Pond's care and treatment, and for decisions as to access and information given to the Langbehn-Pond family about Ms. Pond's situation.  On information and belief, the plaintiffs allege that Ms. Pond was semi-conscious and responsive at the time of her arrival at Ryder and for several hours afterwards.

Ms. Langbehn informed the admitting clerk at Ryder that she was Ms. Pond's life partner and offered to provide relevant medical history and information.  She also indicated that was the family member who was to receive information about Ms. Pond's condition, explained that the children were their jointly adopted children, and emphasized her need to be with Ms. Pond as soon as possible. The admitting clerk, who controlled family members' access to emergency personnel attending patients at Ryder, rejected Ms. Langbehn's offer to provide information about Ms. Pond. She also refused to provide Ms. Langbehn with information about Ms. Pond's condition, and over the next eight hours, denied the family the ability to see or be with Ms. Pond.

Subsequently, Garnett Frederick, a Jackson social worker, spoke to Ms. Langbehn.  He told Ms. Langbehn that she should not expect to be provided any information about or access to Ms. Pond because they were in an "anti-gay city and state."  Mr. Frederick also told Ms. Langbehn that, because it was a holiday weekend, she would not be able to get before a court in order to secure the legal papers necessary for her to get information about or access to Ms. Pond.

At 4:15 p.m., doctors at Ryder determined that Ms. Pond had experienced an aneurysm.[3]  At approximately the same time, Ryder personnel received, by fax, a copy of Ms. Pond's executed power of attorney, which allowed Ms. Langbehn to act as Ms. Pond's guardian and make medical

---

[2]Both Ryder and Jackson are operated by the Public Health Trust.

[3]An aneurysm is a "morbid dilatation of the wall of a blood vessel, usu[ally] an artery."  1 Shorter Oxford English Dictionary 79 (5th ed. 2002).

decisions in case of incapacity.  That document was then placed in Ms. Pond's patient file.  Despite receipt of the power of attorney, no one at Ryder, including the defendants, acknowledged the legal effect of the document, or allowed Ms. Langbehn to have information about, or access to, Ms. Pond. The plaintiffs allege that Doctors Zauner and Cruz knew, or should have known, about the executed power of attorney. Jackson personnel (it is unclear who) did not allow Ms. Langbehn to sign admission or consent forms for Ms. Pond.  They did, however, allow Ms. Pond's father (at what time is unclear) to sign authorization forms for Ms. Pond's medical treatment. Jackson personnel also did not allow Ms. Langbehn to receive Ms. Pond's medical records.

At 4:30 p.m., Ms. Pond was given some medicine.  From 4:15 to 5:20 p.m., no one gave Ms. Langbehn any information about Ms. Pond or sought her consent for any medical treatment.  At around 5:20 p.m., medical personnel placed a central line and a "ventria" during a surgical procedure, on Ms. Pond, as well as a brain monitor.  Ms. Langbehn, who spoke to one of the attending physicians at that time, consented to the placement of a brain monitor.

At approximately 6:10 p.m., two doctors (the complaint is silent as to which ones) spoke to Ms. Langbehn about Ms. Pond's condition and surgical options.  Ms Langbehn insisted on calling Ms. Pond's parents, who were placed on speaker phone with the doctors.  During this conversation the doctors learned that Ms. Pond's condition had deteriorated and suggested that surgery was not advisable.  Ms.  Langbehn asked to see Ms. Pond and told the doctors that Ms. Pond was an organ donor.  She repeated this request on behalf of herself and the children 10 minutes later.  Ms. Langbehn was told (it is unclear by whom) that they would be able to see Ms. Pond as soon as she was "cleaned up," and a doctor (again it is unclear which one) admitted that there were no medical or other legitimate reasons to prevent the family from being with Ms. Pond.  Notwithstanding these representations, Ms. Langbehn and the children were not taken to the restricted area where Ms. Pond was located.

About 40 minutes later, at 6:50 p.m., a priest escorted Ms. Langbehn into the trauma area, where Ms. Pond lay alone.  The priest administered last rites, with Ms. Langbehn present.  Ms. Langbehn was escorted out of the trauma area at 6:55 p.m., once the last rites had been administered. During this time, other families, including those with minor children, were given information by the clerk and were escorted in and out of the restricted area to see their relatives.  Throughout the

evening, Ms. Pond was placed in restraints for her own protection and because no family members were allowed to provide care and supervision.

Every 20 minutes or so, Ms. Langbehn requested permission to see Ms. Pond. The clerk, as she had done before, denied the requests and provided no updates on Ms. Pond's condition. At 10:30 p.m., Ms. Pond was transferred from Ryder to Jackson Memorial Hospital's Neurosurgery Intensive Care Unit. The clerk failed to tell Ms. Langbehn that Ms. Pond had been transferred.

Ms. Pond's sister and brother-in-law arrived from Jacksonville at around 11:30 p.m. Ryder personnel recognized them as Ms. Pond's relatives, informed them of the transfer, and gave them Ms. Pond's new room number. Ms. Langbehn and her children were able to visit with Ms. Pond at this time. Significantly, however, the plaintiffs do not allege that they were denied access to, or visitation with, Ms. Pond after her transfer and before her death.

Soon after Ms. Pond's death, Jackson personnel gave Ms. Pond's parents copies of their daughter's confidential medical records, even though they had not requested them and even though neither was listed as Ms. Pond's healthcare surrogate. Ms. Langbehn was not given Ms. Pond's medical records even though she requested them.

Jackson's policies, as stated on the hospital's public website and elsewhere, promise an environment that preserves dignity; the right to an environment free from mental, sexual, and verbal abuse; recognition of powers of attorney and designations of health care surrogates; crisis and bereavement counseling 24 hours a day at Ryder; social workers to provide emotional support for friends and family and facilitate family involvement with the entire treatment team; and health care with kindness and respect for patients' diverse backgrounds and rights to dignity. On information and belief, the plaintiffs allege that Jackson has promulgated rules prescribing reasonable visitation policies, and that Jackson has a "liberal visitation policy" which allows visitors "as soon as it is humanly possible and appropriate."

The plaintiffs allege that Ms. Langbehn became physically ill and suffered from stomach pain, nausea, and vomiting at various times on February 18, 2007, due to her inability to comfort Ms. Pond while she was dying. The plaintiffs also allege that, as result of the defendants' actions, Ms. Langbehn and the children (Danielle, Katie, and David) suffered physical injuries, including the exacerbation of Ms. Langbehn's multiple sclerosis symptoms (which required hospitalization),

severe psychological distress, trauma, nausea, insomnia, nightmares, severe depression, and symptoms of post-traumatic stress disorder.

### III. DISCUSSION

The plaintiffs – Ms. Langbehn, Danielle, Katie, David, and Ms. Pond's Estate – have pled 8 claims under Florida law.[4] All of those claims arise out of their alleged improper treatment by personnel at Ryder and Jackson on February 18, 2007. Significantly, the plaintiffs do not allege that Ms. Pond's medical care was inadequate. Nor do they contend that such treatment was rendered without appropriate consent or informed consent, or that Ms. Langbehn would have done anything else differently concerning Ms. Pond's medical care had she been given more updates and information on her status.

The plaintiffs seek compensatory damages for psychological trauma and/or emotional distress, as well as for certain physical injuries brought about by the emotional distress. In the alternative, the plaintiffs seek nominal damages. They also seek punitive damages.

### A. COUNTS I-IV

In Count I, the plaintiffs assert that the Public Health Trust and Doctors Zauner and Cruz were negligent in failing to provide timely and sufficient medical information about Ms. Pond, failing to allow Ms. Langbehn access to Ms. Pond so as to allow her to make proper medical decisions as a surrogate, failing to respect Ms. Langbehn's requests on behalf of Ms. Pond, failing to provide Ms. Pond (a dying patient) with reasonable access to her family without medical or other legitimate justification, failing to offer the Langbehn-Pond family basic dignity and respect, failing to recognize Ms. Langbehn as Ms. Pond's life partner, failing to recognize the children as part of Ms. Pond's family, and violating Jackson's policies (regarding provision of care, patient access, and communications with relatives). The plaintiffs do not specify in Count I what damages they are alleging, but their incorporation of earlier paragraphs of the amended complaint indicate that they are seeking damages for emotional distress, exacerbation of Ms. Langbehn's multiple sclerosis, trauma, nausea, insomnia, nightmares, severe depression, and symptoms of post-traumatic stress disorder. In Counts II and III, the plaintiffs assert claims for negligent infliction of emotional distress

---

[4]Subject-matter jurisdiction exists by virtue of diversity. *See* 28 U.S.C. § 1332(a)(1).

against the Public Health Trust, Mr. Frederick, and Doctors Zauner and Cruz based on their alleged negligent refusal to allow them to see Ms. Pond without any "medical necessity or medical or other legitimate justification," failure to afford them basic dignity and respect by denying them the ability to be with Ms. Pond as she was dying, failure to acknowledge Ms. Langbehn's power of attorney, failure to allow Ms. Langbehn access to Ms. Pond as her surrogate, failure to provide written notification to Ms. Langbehn that her surrogacy had begun, violation of Jackson's policies regarding provision of care, patient access, and communications with relatives, failure to respect the medical decisions of Ms. Langbehn as Ms. Pond's surrogate, failure to treat Ms. Pond with respect, violation of Jackson's policies with regards to sexual orientation, and failure to provide appropriate social services (including crisis and bereavement counseling). In Count IV, all of the plaintiffs sue the Public Health Trust, Mr. Frederick, and Doctors Zauner and Cruz for negligence per se.

### 1. THE INDIVIDUAL DEFENDANTS

At oral argument, the plaintiffs conceded that their negligence claims in Counts I-IV against the individual defendants – Mr. Frederick and Doctors Zauner and Cruz – fail. I agree with this concession, for under Florida law public employees are statutorily immune from tort claims arising out of actions in the course of their employment, unless the employee "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *See* Fla. Stat. § 768.28(9)(a). *See also Jaar v. University of Miami,* 474 So.2d 239, 243-45 (Fla. 3rd DCA 1985) (doctor acting as agent of Public Health Trust at Jackson was immune from claim of negligence). Accordingly, Counts I-IV are DISMISSED WITH PREJUDICE as to Mr. Frederick and Doctors Zauner and Cruz, and I proceed to analyze the negligence and negligence per se claims against the Public Health Trust.

### 2. COUNTS I-III: DUTY

A claim for negligence requires four elements: (1) the existence of a duty to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a breach of that duty; (3) a "reasonably close causal connection" between the breach and the resulting injury; and (4) actual harm. *See Williams v. Davis,* 974 So.2d 1052, 1056 (Fla. 2007). The defendants contend that under principles of tort law they did not owe any legal duty, at Ryder, to give the plaintiffs information about Ms. Pond's treatment or condition, to allow the plaintiffs to visit Ms. Pond, or to

provide the plaintiffs with grief and bereavement counseling. The plaintiffs counter that accepted industry-wide medical standards (e.g., the standards set forth by the Joint Commission on Accreditation of Healthcare Organizations) and Jackson's own policies can be the bases for imposition of a legal duty in tort.

The existence of a duty is a question of law in Florida, and the "duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502, 503 (Fla. 1992). "Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *Id.* at 503. "The statute books and case law . . . are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result." *Id.* A duty may arise from a number of sources, including legislative enactments and administrative regulations, judicial interpretations of such laws, other judicial precedent, and the facts of the case. *See Goldberg v. Fla. Power & Light Co.,* 899 So.2d 1105, 1110 (Fla. 2005).

As the Fourth District has explained, "[f]inding that a legal duty exists in a negligence case involves the public policy decision that a defendant should bear a given loss, as opposed to distributing the loss among the general public." *Biglen v. Fla. Power & Light Co.,* 910 So.2d 405, 409 (Fla. 4th DCA 2005). Nevertheless, the Florida Supreme Court has recently cautioned that "abstract notions of sound public policy are not proper judicial considerations" in determining whether a duty exists. *Wallace v. Dean,* 3 So.3d 1035, 1041 n.9 (Fla. 2009). *See also Williams,* 974 So.2d at 1056 (duty depends on evaluation of concept of foreseeability of harm).

I agree with the plaintiffs that doctors and hospitals owe a general duty to a patient to give her material information necessary for her to make informed decisions about her medical care – including information about the patient's own condition – and if the patient is incompetent or unconscious, to provide that material information to a person who is legally able to make medical decisions on the part of the patient (e.g., a parent acting for a minor, a spouse, a relative, a health care surrogate, a legal guardian, or someone acting under a power of attorney) and who is available. Such a person acting pursuant to "instructions regarding life-sustaining treatment" left by the patient has

the responsibility to "make the medical choice that the patient, if competent, would have made." *See In re Guardianship of Browning*, 568 So.2d 4, 13 (Fla. 1990); Fla. Stat. § 765.102 (allowing for a procedure that "designat[es] another person to direct the course of [a patient's] medical treatment upon [the patient's] incapacity"). It is easily foreseeable that the patient (or maybe even the person acting on behalf of the patient) will suffer harm if medical professionals do not provide material information necessary for making an informed decision about medical care. *See, e.g.*, *Pate v. Threlkel,* 661 So.2d 278, 281 (Fla. 1995) (if the statutory standard of care requires a reasonably prudent health care provider to warn a patient of the genetically transferable nature of a condition, then a duty exists); *Buckner v. Allergan Pharm., Inc.,* 400 So.2d 820, 823 (Fla. 5th DCA 1981) (a doctor's duty is to inform his patient about what a reasonable prudent medical specialist would tell a person of ordinary understanding concerning possible benefits, risks, and harm so that patient can make intelligent decision).

This limited duty, however, does not extend to relatives, friends, or loved ones who do not have decision-making authority as to a patient's medical treatment. Much of a patient's medical information is private and confidential under both state and federal law, and I do not believe that the Florida Supreme Court would impose a duty in tort on doctors or hospitals to provide medical updates on a patient's condition or prognosis or treatment to third parties who would simply like to be informed. Furthermore, this limited duty does not include providing regular medical updates on a patient's condition if such updates are not necessary to making medical decisions. Relatives, loved ones, and health care surrogates will of course want such updates, and doctors and hospitals may and usually should – without violating privacy laws – provide some updates. But they have no duty under Florida tort law to do so. Thus, to the extent that the plaintiffs are complaining in Counts I-III about the defendants not providing them updates on Ms. Pond's condition at 20-minute intervals when Ms. Langbehn asked for information, those claims fail as a matter of law to the extent that such updates were unnecessary for making decisions about treatment. *Cf. Smith v. Methodist Hosp. of Ind.,* 569 N.E.2d 743, 746 (Ind. App. 2 Dist. 1991) (addressing claim for intentional infliction of emotional distress: "[T]he question raised is whether Methodist had an independent duty to disclose the incompetent patient's *condition* to the patient's family. We hold Methodist did not owe a duty

to [the] Smiths to advise them of Richard's condition where that information was not related a course of medical treatment.").

Here, then, under Counts I-III, any duty to provide information about Ms. Pond's condition and to allow medical decisions by Ms. Pond or on her behalf ran only to Ms. Pond and to Ms. Langbehn, her health care surrogate. The defendants did not have any duty under Florida law to provide such information about Ms. Pond to the children, who did not have the authority to make any medical decisions on her behalf. Even if such a duty to the children somehow existed, any such duty would have been discharged by providing information to Ms. Langbehn and by allowing Ms. Langbehn to make medical decisions on behalf of Ms. Pond. *See Pate,* 661 So.2d at 282 (any duty on part of doctors to warn patient that her condition was genetically transferrable ran to patient's children, despite lack of privity, but duty would be discharged by warning patient, and doctors would not have to separately warn children).

Usually the question of breach is for the trier of fact, *see Marriott Int'l, Inc. v. Perez-Melendez,* 855 So.2d 624, 628-29 (Fla. 5th DCA 2003) (citing cases), but where the facts are undisputed, or are viewed in the light most favorable to the plaintiff, the question of breach can be decided by the court on a motion to dismiss, a motion for summary judgment, or a motion for directed verdict. *See, e.g., L.A. Fitness Int'l, LLC v. Mayer*, 980 So.2d 550,557-62 (Fla. 4th DCA 2008); *Franco v. Miami-Dade County*, 947 So.2d 512, 517 (Fla. 3rd DCA 2007); *St. Joseph's Hospital v. Cowart,* 891 So.2d 1039, 1041-42 (Fla. 2nd DCA 2004). The allegations in the amended complaint show that there was no breach, and the issue can be decided as a matter of law. Ms. Pond arrived a Ryder at around 3:30 p.m. Ryder received Ms. Langbehn's power of attorney at around 4:15 p.m., at about the same time that doctors determined that Ms. Pond had suffered an aneurysm. Afterwards, doctors twice talked to, and consulted with, Ms. Langbehn – as Ms. Pond's health surrogate – about possible treatment options. First, at 5:20 p.m. doctors spoke to Ms. Langbehn about the need for a brain monitor, and Ms. Langbehn consented to the placement of such a monitor. Second, at around 6:10 p.m., doctors spoke to Ms. Langbehn about Ms. Pond's condition and possible surgical options. At Ms. Langbehn's request, Ms. Pond's parents were placed on speakerphone to discuss these issues. During the ensuing conversation, the doctors learned that Ms. Pond's condition had deteriorated and suggested that surgery was not a option. Not surprisingly, at

oral argument the plaintiffs were unable to point to a single example of what Ms. Langbehn would have done differently if she had been given more information about Ms. Pond. In the words of the plaintiffs' counsel, it would "be speculative as to what she would have done."

There is no allegation that Ms. Langbehn insisted on surgery or some other procedure or treatment that was not carried out. In fact, when she apparently realized that Ms. Pond might not survive, Ms. Langbehn informed the doctors that Ms. Pond was an organ donor. A priest performed last rites at around 6:50 p.m., thereby indicating that, as of that time, there was nothing else that doctors could do for Ms. Pond. As of that time, therefore, because there are no allegations that further medical decisions had to be made as to or on behalf of Ms. Pond, doctors had no further legal duty actionable in tort to provide Ms. Langbehn with updates about Ms. Pond.

I now turn to the plaintiffs' allegations that the defendants had a duty to allow them visitation with Ms. Pond. Under general principles of Florida tort law, *see Hartford Acc. & Indemnity Co. v. Beaver,* 466 F.3d 1289, 1291-92 (11th Cir. 2006), the plaintiffs must "demonstrate that the defendant[s] owed a 'duty, or obligation, recognized by the law, requiring the[m] . . .to conform to a certain standard of conduct, for the protection of others against *unreasonable risks*.'" *Williams,* 974 So.2d at 1056 (emphasis added) (quoting *Clay Elec. Coop., Inc. v. Johnson,* 873 So.2d 1182, 1185 (Fla. 2003)). As the Supreme Court held in *Williams,* not every risk creates a corresponding duty. *See* 974 So.2d at 1054, 1062 (owner or residential property did not owe duty to motorist to cut or trim foliage that did not extend into the public right-of-way, even though foliage allegedly obstructed motorist's view of other traffic as she approached intersection). There is no claim here that Ms. Langbehn was unable to make an informed decision about medical care without being able to see or visit Ms. Pond. The visitation claim, therefore, is separate from the claim about receiving sufficient information to allow an informed decision as to medical care.

Although this is necessarily an *Erie* guess, I predict that the Florida Supreme Court would hold that doctors at a trauma unit do not have a freestanding legal duty, untethered to informed consent by a patient or health care surrogate, to allow visitation with a patient who is in critical condition and undergoing treatment – as was Ms. Pond from 3:30 p.m. to about 6:30 p.m. – or to allow visitation with a terminal patient  – as was Ms. Pond from 6:30 p.m. to 11:30 p.m. – who is

going to be transferred to a regular room where visitation will be permitted.[5]   It may sometimes make sense for doctors to allow close relatives to visit a patient inside a hospital, even in a trauma unit or an intensive care unit, unless they have medical reasons for not allowing visitation.  Visitation may, in certain situations, even be therapeutic.  But decisions as to visitation must be left to the medical personnel in charge of the patient, without second-guessing by juries and courts.  A trauma unit is not like a regular hospital setting, and visitors may interfere with what medical personnel are trying to accomplish in a difficult environment, or bring with them germs or microbes that create other unexpected problems.  A decision to not allow visitation in a trauma unit setting – where emotions are already at their breaking point and where lives may literally hang in the balance – does not create "unreasonable risks" of harm to the patient or to the putative visitors so as to establish a legal duty in tort.  *Cf. Maloney v. Conroy,* 545 A.2d 1059, 403 (Conn. 1988) (refusing to recognize claim for bystander emotional distress brought by daughter who visited her mother, a patient at hospital, and allegedly saw her mother deteriorate due to medical malpractice: "Medical judgments as to the appropriate treatment of a patient ought not to be influenced by the concern that a visitor may become upset from observing such treatment or from the failure to follow some notion of the visitor as to care of the patient.  The focus of the concern of medical care practitioners should be upon the patient and any diversion of attention or resources to accommodate the sensitivities of others is bound to detract from that devoted to patients.").[6]

---

[5]I do not address what legal duty doctors and hospitals may or may not have to allow visitation in a non-trauma setting or when a minor child is a patient, as these scenarios are not present here.  I note, moreover, that there is no allegation that the plaintiffs were denied visitation with Ms. Pond once she was transferred to a non-trauma room, and at oral argument the plaintiffs' counsel acknowledged that Ms. Langbehn and the children were able to see Ms. Pond at around 11:30 p.m.

[6]If, as the plaintiffs allege, Doctors Zauner and Cruz failed to allow visitation without a legitimate medical reason, it could be said that they were not as sympathetic as they should have been, and even exhibited a lack of sensitivity.  But, as the Florida Supreme Court said in different context, "a cause of action does not exist for lack of empathy except, perhaps, for negligent or intentional infliction of emotional distress."  *Fla. Patient's Comp. Fund v. Von Stetina,* 474 So.2d 783, 790 (Fla. 1985).

I recognize that the Washington Court of Appeals recently ruled, in an unpublished opinion, that a patient's life partner could state claims for outrage and negligent infliction of emotional distress against a critical care nurse who excluded her from the patient's hospital room for extended periods the night before the patient's death, given allegations that the nurse acted without any valid medical reasons and that the patient's doctor had allowed the partner to remain in the room.  *See Reed v. ANM Healthcare,* 147 Wash. App. 1044, 2008 WL 5157869, *1-*3 (Ct. App. 1 Div. 2008).  Significantly, however, the Washington Court of Appeals explained that – given Washington statutory law – the issue was not whether the nurse's "decision to exclude [the partner] breached the standard of care.  Rather, . . . the critical question is whether [the nurse's] actions in excluding [the partner] were medically motivated."  *See id.* at *4.  If "the exclusion was to address [the patient's] medical needs, then [the partner's] injuries occurred as a result of health care and her common law tort claims are precluded by RCW 7.70.010 and .30.  If the exclusion was not based on [the patient's] medical needs, then [the partner's] common law tort claims remain viable."  *See id.*

On its facts,  *Reed* is distinguishable because, according to the partner's version of events, the patient's doctor had already approved visitation, and it was a nurse who then countermanded that medical directive.  The facts here are markedly different, as the plaintiffs allege that Doctors Zauner and Cruz  did not permit visitation.   And if  *Reed* is read broadly to create a duty in tort on the part of doctors to allow visitation in an trauma/intensive care setting unless they have legitimate medical reasons for precluding visitation, I  do not believe that the Florida Supreme Court would follow *Reed.*

Accordingly, Counts I-III are DISMISSED WITHOUT PREJUDICE as to the Public Health Trust.

### 3. COUNTS I-III: THE IMPACT RULE

Assuming I have erred on my rulings on duty, and in case there is an appeal, I address Florida's impact rule and its application to Counts I-III.

The existence of a duty does not mean that Counts I-III survive the defendants' motion to dismiss.  Nor does the possibility of a breach of duty.  The defendants argue that the impact rule bars the plaintiffs' claims for emotional distress damages, while the plaintiffs assert that the rule should not be applied in this case.

Generally stated, the impact rule provides that "[b]efore a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress injuries suffered must flow from personal injuries the plaintiff sustained in an impact.  The rule actually requires some impact on the plaintiff or, in certain situations, the manifestation of severe emotional distress such as physical injuries or illness." *Fla. Dep't of Corr. v. Abril*, 969 So.2d 201, 206 (Fla. 2007) (citations omitted).  The impact rule, however, is more easily stated than applied, for the Florida Supreme Court has  ruled in a number of cases that certain tort scenarios present exceptions to the rule.  *See, e.g.*, *Abril*, 969 So.2d at 206-07 (impact rule does not bar recovery by patient of emotional distress damages in claim for negligent disclosure of HIV test results); *Gracey v. Eaker*, 837 So.2d 348, 356 (Fla. 2002) (impact rule does not bar claim for emotional distress resulting from psychotherapist's breach of confidentiality); *Tanner v. Hartog*, 696 So.2d 705, 708-09 (Fla. 1997) (impact rule inapplicable in claim for negligent stillbirth); *Kush v. Lloyd*, 616 So.2d 415, 422-23 (Fla. 1992) (impact rule does not apply to claim of wrongful birth of deformed child because the rule is not generally applicable (a) if emotional damages are an additional "parasitic" consequence of conduct that is itself a freestanding tort, or (b) to "recognized torts in which damages often are predominantly emotional, such as defamation or invasion of privacy").

The Florida Supreme Court has noted that it is difficult to predict how it will apply (or not apply) the impact rule, *see, e.g., Tanner,* 696 So.2d at 708 ("[w]e recognize that there is a legitimate legal argument which can be directed against any particular legal theory upon which recovery in the instant case might be predicated and that the law does not provide a remedy for every wrong"), and several Justices on both sides of the impact rule debate have criticized the Court's ad hoc approach. *Compare, e.g., Abril,* 969 So.2d at 208-09 (Pariente, J., concurring) (noting that Court's "case-by-case approach as to the impact rule has done nothing to stabilize the law or to clarify when an exception will be recognized," and calling for abrogation of impact rule), *with, e.g., Gracey,* 837 So.2d at 359-62 (Harding, J., dissenting) (criticizing ad hoc approach and advocating adherence to impact rule). The short of the matter is that there is no good way to figure out whether or not the Florida Supreme Court would apply the impact rule in this case.  Predicting the Florida Supreme Court's future approach to the impact rule is even more perilous given that the Court now has four new Justices.

Fortunately, there is an Eleventh Circuit case which indicates that the impact rule will apply in cases like this one. In *Gonzalez-Jimenez de Ruiz v. United States,* 378 F.3d 1229 (11th Cir. 2004), the common-law wife of a federal prisoner who died from cancer while in custody filed an action against the United States under the Federal Tort Claims Act on behalf of herself and her children. The complaint included claims for intentional infliction of emotional distress and negligent infliction of emotional distress, based on allegations that Bureau of Prison officials had not told the wife the truth about her husband's terminal condition, had failed to provide her and her family with reasonable access to her husband during his illness, had failed to inform them of her husband's death, and had delayed in transporting her husband's remains. The Eleventh Circuit, applying Florida law under the FTCA, *see id.* at 1230 n.1, dismissed the wife's claims for lack of standing, but then addressed the children's claim for negligent infliction of emotional distress. It affirmed the district court's ruling that the children had failed to allege sufficient physical injury as a result of the emotional trauma: "The facts alleged do not come anywhere close to constituting significant physical injury. While the children claim they suffered mental anguish from the BOP's actions, they failed to establish any major adverse physical impact." *Id.* at 1231.

*Gonzalez-Jimenez de Ruiz* does not have identical facts because it involved medical treatment of an inmate at a prison medical facility, but some of the allegations and claims (e.g., withholding information about a patient's condition, failing to provide access to a patient) nonetheless generally mirror those made by the plaintiffs here. In the absence of any other relatively similar Florida cases, I conclude that *Gonzalez-Jimenez de Ruiz* and other Florida cases arising in the health care setting require application of the impact rule here. These other Florida cases include *Cowart,* 891 So.2d at 1043 (applying impact rule and precluding recovery for emotional distress by emergency room patient who was bitten by spider, where bite itself was not actionable), *Brooks v. South Broward Hospital District,* 325 So.2d 479-80 (Fla. 4th DCA 1975) (applying impact rule to bar negligence claim by parents of deceased newborn child against hospital for having lost child's body), and *Carter v. Lake Wales Hospital Ass.,* 213 So.2d 898, 899-900 (Fla. 2nd DCA 1968) (applying impact rule to reject negligence claim of parents against hospital whose employees mistakenly allowed parents' newborn child to be taken home by a third person). Thus, in order to state a claim on Counts I-III, the plaintiffs must allege facts that satisfy the impact rule.

14

None of the plaintiffs have alleged that the defendants' alleged wrongful actions led to a physical impact of any sort.  Where, as here, "the plaintiff has not suffered an impact, the complained-of mental distress must be 'manifested by physical injury,' the plaintiff must be 'involved' in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must suffer the complained-of mental distress and accompanying physical impairment 'within a short time' of the incident." *Willis v. Gami Golden Glades, LLC,* 967 So.2d 846, 850 (Fla. 2007).   The psychological trauma "must cause a demonstrable physical injury such as death, paralysis, muscular impairment, or similarly objectively discernible physical impairment before a cause of action may exist. . . . [T]here is no cause of action for psychological trauma alone when resulting from simple negligence." *Brown v. Cadillac Motor Car Division,* 468 So.2d 903, 904 (1985).

Ms. Langbehn alleges that, as a result of the defendants' conduct, while at Ryder she became physically ill, experienced stomach pain and nausea, and vomited.  Thereafter, she suffered exacerbation of her multiple sclerosis symptoms requiring hospitalization not long after the events at Ryder.  These allegations by Ms. Langbehn, though somewhat thin, would be sufficient to satisfy the impact rule at this stage of the litigation (assuming there was a duty and a sufficiently alleged breach). *See Zell v. Meek,* 665 So.2d 1048, 1049 (Fla. 1995) ("the interval of time between the psychic trauma and the physical manifestation is one factor in proving causation").

Ms. Pond and the children do not fare as well in terms of the impact rule.  With respect to Ms. Pond, the amended complaint alleges that she was semi-conscious and responsive upon arrival at 3:30 p.m. and for several hours afterwards.  The amended complaint also alleges that she was restrained throughout the evening for her own protection, and that she was touched  in the course of treatment.  As the defendants correctly point out, however, to satisfy the impact rule the  contact must be part of the alleged wrongful conduct.  *Compare Willis,* 967 So.2d at 850-51 (robber's putting of pistol to plaintiff's head during robbery satisfied impact rule where claim for negligent infliction of emotional distress was based on hotel's alleged negligence in failing to provide adequate security), with *R.J. v. Humana of Fla.*, 652 So.2d 360, 364 (Fla. 1995) (stating, in case involving alleged negligent misdiagnosis, "that touching of a patient by a doctor and the taking of blood for ordinary testing would not qualify for a physical impact," but "other more invasive medical treatment

15

or the prescribing of drugs with toxic or adverse side effects would so qualify"). *Cf. Hagan v. Coca-Cola Bottling Co.*, 804 So.2d 1234, 1241-42 (Fla. 2001) (ingestion of soft drink which was contaminated by substance constitutes impact and allows claim for emotional distress). Here any touching of Ms. Pond by medical personnel during the course of her treatment, including the use of restraints, is not alleged to be independently wrongful. There is no claim of medical malpractice, and no claim of lack of informed consent. Ms. Pond therefore does not satisfy the impact rule on Counts I-III. The children's allegations (severe psychological distress, trauma, insomnia, nightmares, nausea, severe depression, and symptoms of post-traumatic stress disorder) also do not set forth the sort of resulting physical injury required by Florida law. The complaint does allege in Count II, that the children have suffered "physical injury." That allegation, however, is conclusory, lacks any factual nexus, and is devoid of any supporting facts so as to survive a motion to dismiss. *See Twonbly,* 550 U.S. at 555-56; *see Gonzalez-Jimenez,* 378 F.3d at 1231.

### 4. COUNT IV: THE NEGLIGENCE PER SE CLAIM

Turning to Count IV, the negligence per se claim against the Public Health Trust, I conclude that it should be dismissed without prejudice. At oral argument, the plaintiffs characterized their negligence per se claim as a "stretch," and I think this was an accurate description. Negligence per se may be pled as a theory if there is a violation of a strict liability statute or rule designed to protect a "certain class of persons from their inability to protect themselves, such as one prohibiting the sale of firearms to minors," or a violation of a statute or rule which "establishes a duty to take precautions to protect a particular class of persons who are unable to protect themselves from a particular injury or type of injury." *See deJesus v. Seaboard Coast R.R. Co.,* 281 So.2d 198, 200-01 (Fla. 1973). Significantly, however, not every violation of a statute or rule constitutes negligence per se; if, for example, a statute only protects the public at large, a violation may only be used as evidence of negligence. *See, e.g., Lingle v. Dion,* 776 So.2d 1073, 1077 (Fla. 4th DCA 2001) (surgeon's failure to maintain hospital staff privileges did not constitute negligence per se in medical malpractice action, as statutes and rules in question – though regulating medical practice and providing for disciplinary actions – did not "purport to give any protections to any particular class of people beyond the public at large").

16

In Count IV, the plaintiffs allege that the Public Health trust, through its employees and agents, failed to honor Ms. Langbehn's power of attorney and failed to recognize the relationships of Ms. Langbehn and the children.  This, the plaintiffs say, violated (1) Jackson's patients' bill of rights, (2) Jackson's policies concerning social work and discharge planning, (3) Jackson's advance directives policies, and (4) the standards of the Joint Commission on Accreditation of Healthcare Organizations (of which Jackson is a member hospital).  None of these sources, even if violated, permit a negligence per se claim. Jackson's internal policies are not statutes enacted by the legislature or regulations duly issued by an administrative agency.  The same goes for the standards of the Joint Commission.

In their response to the motion to dismiss, the plaintiffs rely on Fla. Stat. § 381.026, the so-called Patients' Bill of Rights, and Fla. Stat. §§ 765.202-205, 765.1103, the Florida Health Care Surrogate Act.  The plaintiffs say in their response that Ms. Pond was denied palliative care, that Ms. Langbehn was not notified in writing that her surrogacy had commenced, and that Ms. Langbehn was not provided access to Ms. Pond's medical records for purposes of making health care decisions. Neither of the statutes cited by the plaintiffs suffices.[7]  First, the Patients' Bill of Rights is only applicable to Ms. Pond (and now to her Estate), and the Healthcare Surrogate Act is only applicable to Ms. Langbehn.  Thus, Ms. Langbehn cannot assert a negligence per se claim under the Patients' Bill of Rights, the Estate cannot assert a negligence per se claim under the Healthcare Surrogate Act, and the children cannot assert a negligence per se claim under either statute.  Second, the Patients' Bill of Rights specifically states that "[t]his section shall not be used for any purpose in any civil or administrative action ad neither expands nor limits any rights or remedies provided under any other law."  Fla. Stat. § 381.026(3).  Given this language, it is apparent (at least to me) that the statute is not meant to protect a particular class of people from a particular injury or risk of injury.  Third, the Health Care Surrogate Act does not impose any duties on hospitals or medical professionals that are meant to protect a specific class of persons from a certain type of injury or risk of injury.  The

---

[7]The defendants' citation to cases such as *Murthy v. N. Sinha Corp.,* 644 So.2d 983, 985 (Fla. 1994), is not very helpful.  These cases focus on legislative intent, but only in the context of addressing whether a cause of action will be allowed under a statute that is silent on the issue. Negligence per se and implied causes of action are separate legal concepts, and the plaintiffs are not seeking to sue directly under the Patients' Bill of Rights or the Florida Health Care Surrogate Act.

plaintiffs' suggestion that the Act "implies" certain rights and correlative duties does not carry the day. *Cf. Paterson v. Deeb,* 472 So.2d 1210, 1216 & n.5 (Fla. 1st DCA 1985) (although it imposed numerous obligations on landlords, the Florida Residential Landlord & Tenant Act, Fla. Stat. § 83.40 et seq., was not the sort of legislative enactment that would support a negligence per se claim).

In addition, there are other problems with the negligence per se claim. Although the plaintiffs suggest in their response that Ms. Pond was denied appropriate palliative care, there are no allegations in the amended complaint to support such a claim or inference. So even if the Health Care Surrogate Act could generally support a negligence per se claim by Ms. Langbehn, the allegations in the complaint are insufficient insofar as they relate to any denial of palliative care. Moreover, the plaintiffs themselves allege that the power of attorney was received around 4:15 p.m. and subsequently placed in Ms. Pond's patient file. It is difficult to see how Ms. Langbehn suffered any injury or damages from the defendants' alleged failure to provide her with written notification that her surrogacy had begun. *See Roberts v. Shop & Go, Inc.,* 502 So.2d 915, 917 (Fla. 2nd DCA 1996) (plaintiff proceeding on negligence per se theory must still show that statutory violation proximately caused his injury). Finally, even if the defendants denied Ms. Langbehn access to Ms. Pond's medical records, there is no allegation in the amended complaint that Ms. Langbehn was unable to make a decision as to medical care or that her decision would have been different had the medical records been provided. Given that the plaintiffs themselves allege that doctors at Ryder did consult with Ms. Langbehn as to the brain monitor and possible surgery for Ms. Pond, and that the amended complaint does not allege that anyone other than Ms. Langbehn made any decisions as to Ms. Pond's medical care, Ms. Langbehn did not suffer any damages from the denial of medical records. *See id.*

In sum, Count IV is DISMISSED WITHOUT PREJUDICE as to the Public Health Trust.

## B. COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Count V, Ms. Langbehn and the children sue Mr. Frederick and Doctors Zauner and Cruz for intentional infliction of emotional distress. This claim fails as a matter of law.

Count V is based on the allegations that Mr. Frederick and Doctors Zauner and Cruz (1) allowed Ms. Pond to move to certain death without letting her family members see her or say goodbye; (2) did not allow family members access to Ms. Pond and did not allow them to comfort

Ms. Pond or be comforted by her in her final hours without any medical or other legitimate justification; (3) refused to treat Ms. Langbehn and the children as Ms. Pond's family members in her last few hours where no medical necessity existed; (4) denied Ms. Langbehn the opportunity to be with Ms. Pond during the last hours of her life; and (5) refused to timely acknowledge the power of attorney or otherwise consult with Ms. Langbehn about Ms. Pond's medical history, wishes, and treatment in a timely and ongoing fashion.

Under Florida law, the tort of intentional infliction of emotional distress is difficult to establish. "[M]ere insults and indignities" are not enough, *see Koutsouradis v. Delta Air Lines, Inc.,* 427 So.2d 1339, 1344 (11th Cir. 2005), and a plaintiff must show, among other things, that the conduct of the defendant was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278-79 (Fla. 1985) (quoting from and adopting standard from the Restatement (Second) of Torts, § 46, comment d (1965)). Whether alleged conduct is so outrageous as to allow a jury to find a defendant liable for intentional infliction of emotional distress is a question of law for the court. *See, e.g., Liberty Mutual Ins. Co. v. Steadman,* 968 So.2d 592, 595 (Fla. 2nd DCA 2007); *De la Campa v. Grifols America, Inc.,* 819 So.2d 940, 943 (Fla. 3rd DCA 2002); *Johnson v. Thigpen,* 788 So.2d 460, 465 (Fla. 1st DCA 2001); *Paul v. Humana Medical Plan, Inc.,* 682 So.2d 1119, 1122 (Fla. 4th DCA 1996).

Given the allegations in the complaint, the defendants may not have allowed the plaintiffs as much visitation as medically permitted or warranted at Ryder, but they did permit Ms. Langbehn to see Ms. Pond for several minutes (at around 6:50 p.m.) when last rites were administered. The plaintiffs, moreover, do not allege that they were denied access to, or visitation with, Ms. Pond after her transfer (at around 10:30 p.m.) and before she died. As to the issue of consent, at around 5:20 p.m. medical personnel at Ryder obtained Ms. Langbehn's permission to place a brain monitor on Ms. Pond, and doctors consulted with Ms. Langbehn around 6:10 p.m. to discuss Ms. Pond's condition and surgical options. During this consultation, the doctors learned that Ms. Pond's condition had deteriorated to the point where surgery was no longer a viable option, and so advised

19

Ms. Langbehn. This, therefore, is not a case in which all access to a terminally ill patient was denied, or in which a health surrogate was not consulted at all on medical treatment or options.[8]

There are a number of cases which, though not directly on point, indicate that the alleged conduct here is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *McCarson,* 467 So.2d at 278-79. These cases include *Foreman v. City of Port St. Lucie,* 2008 WL 4356273, *2 (11th Cir. 2008) (plaintiff's allegation that police officer pointed BB gun (which she did not know was empty) at her husband's chest and pulled the trigger did not establish intentional infliction of emotional distress under Florida law), *Koutsouradis v. Delta Air Lines, Inc.,* 427 F.3d 1339, 1344-45 (11th Cir. 2005) (male airline employee's licking lips and making sexually explicit comments to female passenger after discovering vibrator in her checked luggage, although distasteful and prompting laughter from other male employees men in the area, did not permit claim for intentional infliction of emotional distress), *Paul,* 682 So.2d at 1120-22 (plaintiff/patient ultimately diagnosed with cancer of the larynx failed to state claim for intentional infliction of emotional distress against doctor whom she first had to see under terms of health insurance plan, despite allegations that doctor failed to diagnose cancer, failed to refer her to an ear, note and throat specialist even after she was diagnosed with cancer, prematurely discharged her after surgery for total laryngectomy, and instructed her husband to clean the surgical site and care for her), and

---

[8]To the extent it matters, the plaintiffs cannot hold Doctors Zauner and Cruz responsible for any anti-gay comments made by Mr. Frederick. An individual is liable for the tortious act of another only where the individual engages in the act "act in concert or pursuant to a common design with the other person, or giv[es] substantial assistance or encouragement to the other person with knowledge that the other's conduct constitutes a breach of duty." *See, e.g.*, *Boggs v. Die Fliedermaus, LLP*, 255 F.Supp.2d 291, 293 (S.D.N.Y. 2003) (applying Restatement (Second) of Torts § 876 to determine whether an individual was liable for the defamatory statement of another) (citations omitted); *Roos v. Morrison*, 913 So.2d 59, 67 n.1 (Fla. 1st DCA 2005) (relying on the Restatement (Second) of Torts § 876 to determine whether joint liability was warranted). *See also Lay v. Roux Laboratories, Inc.*, 379 So.2d 451, 452 (Fla. 1st DCA 1980) (finding that "vicious verbal attacks" and racial epithets constitute "extremely reprehensible" conduct, but, without more, are insufficient to show intentional inflection of emotional distress). In addition, contrary to Mr. Frederick's statements that Ms. Langbehn should not expect to be provided with any information on the condition of Ms. Pond, Ms. Langbehn was accepted as Ms. Pond's health care surrogate and was consulted as to Ms. Pond's treatment.

*Scheller v. Am. Medical Int'l, Inc.,* 502 So.2d 1268, 1270-71(Fla. 4th DCA 1987) (even though hospital and its employees denied pathologist basic support services, falsely accused pathologist of theft, evicted pathologist from his office, gave medical records of pathologist's patients to other doctors without pathologist's consent, and published false information about pathologist's income, conduct was not so outrageous as to allow a claim for intentional infliction of emotional distress). *Compare Steadman,* 968 So.2d at 595-96 (delay of workers' compensation carrier in paying for lung transplant ordered by judge, by itself, was not enough to constitute tort of intentional infliction of emotional distress, but plaintiff nevertheless stated claim because she also alleged that carrier delayed the payment based on her limited life expectancy and knew that emotional distress caused by delay could cause plaintiff's death and eliminate need for payment).

Also of note is *Gonzalez-Jimenez de Ruiz,* discussed earlier.  In that case, the common-law wife of a federal prisoner who died from cancer while in custody filed an action against the United States under the Federal Tort Claims Act on behalf of herself and her children.  She alleged prison officials had not told her the truth about her husband's terminal condition, had failed to provide her and her family with reasonable access to her husband during his illness, had failed to inform them of her husband's death, and had delayed in transporting her husband's remains.  Applying Florida law, *see* 378 F.3d at 1230 n.1, the Eleventh Circuit ruled that the common-law wife's claims failed for lack of standing, but ruled that the claims of the children for intentional infliction of emotional distress failed because it was not shocking or unexpected that access to prisoners was restricted, and because substandard medical care – though regrettable – and deception did not meet the requisite standard.  *See id.* at 1231.

Count V is therefore DISMISSED WITHOUT PREJUDICE as to all defendants.

### C. COUNTS VI-VIII: BREACH OF A FIDUCIARY RELATIONSHIP

In Count VI, Ms. Pond's Estate sues the Public Health Trust and Doctors Zauner and Cruz for breach of a fiduciary relationship.  In Count VII, Ms. Langbehn sues the Public Health Trust and Doctors Zauner and Cruz for breach of a fiduciary relationship.  In Count VIII, Ms. Langbehn and the children sue the Public Health Trust and Mr. Frederick for breach of a fiduciary relationship.

Addressing these claims in reverse order, Counts VII and VIII are dismissed without prejudice. The existence of a general duty under negligence law does not mean that there is a

corresponding fiduciary duty.  As the Florida Supreme Court has explained, "under Florida law, negligence claims and breach of fiduciary duty are separate causes of action."  *Wachovia Ins. Services, Inc. v. Toomey,* 994 So.2d 980, 990 (Fla. 2008).  In order for there to be a breach of a fiduciary relationship, there must of course be a fiduciary relationship, such as where "confidence is reposed by one party and trust accepted by the other.  To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."  *Brigham v. Brigham,* 2009 WL 454492, *12 (Fla. 3rd DCA 2009) (quotation marks and citations omitted).  Even in the medical malpractice context, a doctor generally does not have a special relationship or owe a duty towards the relatives of a patient.  *See, e.g., Santa Cruz v. Northwest Dade Comm. Health Center, Inc.,* 591 So.2d 444, 445 (Fla. 3rd DCA 1991) (health center did not have "special relationship" with patient's brother, and therefore could not be sued for medical malpractice when patient shot brother following treatment).[9] There are exceptions in the malpractice context, such as where a doctor knows his patient has a genetically transferable condition.  In that scenario, a doctor has a duty to warn the patient of the nature of the condition and of the importance of testing his or her children for the condition, and that duty also runs to the patient's children despite the lack of privity.  But that duty towards the children can be discharged by simply providing the warning to the patient, given that in most instances a doctor is prevented from disclosing the patient's medical condition to others without the patient's consent. *See Pate,* 661 So.2d at 281.  As far as I can tell, no court has held (or even suggested) that a doctor at a trauma center, or a social worker at such a facility, has a fiduciary relationship with a patient's relatives (even those who are health care surrogates) so as to require the doctor or social worker to allow the relatives visitation with the patient, or provide crisis and bereavement counseling, or keep the relatives apprised of the patient's status.  As a matter of law, Mr. Frederick and Doctors Zauner and Cruz did not have a fiduciary relationship with the family members of their patient, Ms. Pond, that imposed upon them a duty to do these things.

Count VI is brought by Ms. Pond's Estate.  The amended complaint alleges that Doctors Zauner and Cruz breached their fiduciary obligations toward Ms. Pond by failing to give Ms.

_____

[9]A doctor also does not have any privity with, or owe any duty to, members of the general public.  *See Joseph v. Shafey,* 580 So.2d 160, 160 (Fla. 3rd DCA 1990).

Langbehn access to Ms. Pond, failing to treat Ms. Pond with respect by denying her visitation privileges during an 8-hour period "while she moved from brain activity to brain death without medical or legitimate justification," failing to provide medical treatment to Ms. Pond in accordance with her wishes, and failing to respond to Ms. Pond's "requests for reasonable family visitation" as expressed through Ms. Langbehn, discriminating against Ms. Pond and her family based on her sexual orientation and/or same-sex relationship, and failing to acknowledge or recognize her validly executed health care power of attorney.  Ms. Pond's Estate seeks damages for "indignities and emotional injury" suffered by Ms. Pond.

The Florida Supreme Court has recognized that there is a fiduciary relationship between a doctor and his patient, such that the doctor breaches his fiduciary duty if he discloses confidential information, *see Gracey,* 837 So.2d at 354-55, or conceals facts known about harm done to the patient, *see Nardone v. Reynolds,* 333 So.2d 25, 29 (Fla. 1976) (discussing issue in context of tolling of statute of limitations for fraudulent concealment), *receded from on other grounds, Hearndon v. Graham,* 767 So.2d 1179 (Fla. 2000).  The alleged breaches set forth in the amended complaint, however, do not come close to these scenarios, and Ms. Pond's Estate has not cited any cases (from anywhere in the country) which hold that a doctor breaches his fiduciary duty to a trauma patient by failing to allow visitation by spouses, partners, children, or relatives.[10]

To the extent that Count VI  alleges in a conclusory manner that Doctors Zauner and Cruz failed to give effect to Ms. Langbehn's rights as the health care surrogate, that conclusory allegation is contradicted by more specific allegations in the amended complaint.  For example, as noted earlier, at 5:20 p.m. doctors spoke to Ms. Langbehn about the need for a brain monitor, and she agreed to the placement of such a monitor.  And at around 6:10 p.m. doctors consulted with Ms. Langbehn about Ms. Pond's condition and surgical options.  During a speaker phone conversation between the doctors, Ms. Langbehn, and Ms. Pond's parents, the doctors learned out that Ms. Pond's condition had deteriorated and that surgery was not advisable.  At that time, Ms. Langbehn, apparently recognizing that Ms. Pond would not recover, told the doctors that Ms. Pond was an organ donor.

---

[10]The Washington case cited by the plaintiffs as supplemental authority, *Reed v. ANM Health Care,* 147 Wash. App. 1044, 2008 WL 5157869 (Ct. App. Div. 1 2008), does not involve a claim for breach of fiduciary duty.

In short, the more specific factual allegations in the amended complaint, which govern over more general ones, demonstrate beyond any doubt that Ms. Langbehn was not denied the right to make any medical decisions on behalf of Ms. Pond.

Count VI is therefore DISMISSED WITHOUT PREJUDICE as to all defendants.

### IV. CONCLUSION

The defendants' motion to dismiss is GRANTED. Counts I-IV are DISMISSED WITH PREJUDICE as to the individual defendants, and are DISMISSED WITHOUT PREJUDICE as to the Public Health Trust. Counts V-VIII are DISMISSED WITHOUT PREJUDICE as to all defendants.

If the plaintiffs' allegations are true, which I assume that they are when deciding the defendants' 12(b)(6) motion to dismiss, the defendants' lack of sensitivity and attention to Ms. Langbehn, Ms. Pond, and their children caused them needless distress during a time of vulnerability. The defendants' failure to provide Ms. Langbehn and her children frequent updates on Ms. Pond's status, to allow Ms. Langbehn and her children to visit Ms. Pond after emergency medical care ceased; to inform Ms. Langbehn that Ms. Pond had been transferred to the intensive care unit, and to provide Ms. Langbehn Ms. Pond's medical records as she requested, exhibited a lack of compassion and was unbecoming of a renowned trauma center like Ryder. Unfortunately, no relief is available for these failures based on the allegations plead in the amended complaint.

If the plaintiffs want to file a second amended complaint, they must do so by October 16, 2009. If no second amended complaint is filed, this case will be closed.

DONE and ORDERED in chambers in Miami, Florida, this 28th day of September, 2009.

Adalberto Jordan
United States District Judge

Copy to:    All counsel of record